**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 26-cr-19 (CKK)** |
| | : | |
| **BRITTANY BLALOCK,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On October 16, 2025, Defendant Karon Blalock pleaded guilty to one count of the operative Indictment charging him with Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl. For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to a period of home confinement at the bottom of the Guideline range set forth below.

## BACKGROUND

Beginning on or about March 2021 and continuing through on or about September 2021, the Defendant conspired to fraudulently apply for and receive forgivable Paycheck Protection Program ("PPP") loans from the Small Business Administration (SBA) during the COVID-19 pandemic. The purpose of the conspiracy was for the Defendant and her co-conspirators to unlawfully enrich themselves by submitting and causing the submission of false and fraudulent applications for PPP loans.

The Defendant's role in the conspiracy was two-fold: she submitted false and fraudulent PPP loan applications to SBA-approved lenders on her own behalf for the purpose of fraudulently obtaining PPP funds, and she also conspired with others for the purpose of aiding their own fraudulent PPP loan applications.

For example, on or about March 19, 2021, the Defendant submitted a "first-draw" PPP loan application to Harvest Small Business Finance, LLC ("Harvest"), a Small Business Lending Company based in Laguna Hills, California. In the loan application to Harvest, the Defendant submitted a form 1040 Schedule C that falsely asserted her purported sole proprietorship earned exactly $100,000 in 2020 and certified that the documents supporting her application were "true and accurate in all material respects."

Harvest approved the Defendant's PPP loan application that included her false certifications and, based on her falsified 1040 Schedule C, determined the PPP loan amount to be $20,833.00, which was the maximum authorized for sole proprietorships under the PPP. The first-draw PPP loan was approved and subsequently disbursed to the Defendant on or about March 23, 2021.

On or about April 11, 2021, the Defendant submitted a "second-draw" PPP loan application to Harvest. In the loan application to Harvest, the Defendant submitted a form 1040 Schedule C that falsely asserted her purported sole proprietorship earned exactly $100,000 in 2020 and certified that the documents supporting her application were "true and accurate in all material respects."

Harvest approved the Defendant's second-draw PPP loan application that included her false certifications and, based on her falsified 1040 Schedule C, determined the PPP loan amount to be $20,833.00. The PPP loan was subsequently disbursed to the Defendant on or about April 22, 2021.

The day after the Defendant submitted her second-draw PPP loan application to Harvest, on or about April 12, 2021, Co-Conspirator-1 ("CC-1") texted the Defendant: "I got 2 people tryna do ppp." The Defendant responded: "Okay." CC-1 then replied: "Ok . . he gone [sic] call u."

On or about April 18, 2021, CC-1 provided his own social security number and the account information for his Andrews Federal Credit Union ("Andrews FCU") account to the Defendant. The Defendant responded: "I need the account number and you need to set up online banking so once I

file you you [sic] can come down here to my room and add your username and password for online banking so they can link you [sic] the account." CC-1 responded to the Defendant by providing her with his Andrews FCU account online banking code.

Between on or about April 19, 2021, and on or about April 21, 2021, CC-1 submitted or caused to be submitted a first-draw PPP loan application and promissory note to Harvest for a PPP loan. Like the Defendant, CC-1's application included a 1040 Schedule C that falsely asserted that his purported sole proprietorship earned exactly $100,000 in 2020. CC-1 further certified or caused to be certified that the documents supporting his application were "true and accurate in all material respects."

After Harvest relied upon the false 1040 Schedule C in CC-1's application, Harvest approved CC-1's PPP application, and CC-1 received and accepted approximately $20,8333.00 in PPP funds in his Andrews FCU account from Harvest via wire transfer on or about April 27, 2021.

Between on or about April 22, 2021, and May 19, 2021, CC-1 submitted or caused to be submitted a second-draw PPP loan application and promissory note to Harvest for an additional PPP loan amount of $20,833.00. This application included a 1040 Schedule C that falsely asserted his purported sole proprietorship earned exactly $100,000 in 2020. He further certified or caused to be certified that the documents supporting his application were "true and accurate in all material respects."

After Harvest relied upon the false 1040 Schedule C Harvest approved CC-1's second PPP application, and CC-1 received and accepted approximately $20,833.00 in PPP funds in his Andrews FCU account from Harvest via wire transfer on or about May 26, 2021.

On or about April 27, 2021, the Defendant texted CC-1: "When that other money come you need to tell me because I gotta explain a few things to you and I need to know exact date so I can

know exact date to start to apply for the forgiveness." CC-1 then responded to the Defendant: "Ok".

On or about August 29, 2021, the Defendant texted CC-1: "I'm working on the forgiveness imma send a code to your phone send it back to me." CC-1 then responded to the Defendant with a seven-digit code.

On or about August 29, 2021, the Defendant submitted a PPP loan forgiveness application for her first-draw PPP loan. In her first-draw PPP loan forgiveness application, the Defendant falsely certified or caused to be falsely certified that "Borrower has complied with all requirements in the Paycheck Protection Program Rules . . . including the rules related to eligible uses of PPP loan proceeds."

On or about August 29, 2021, the Defendant submitted a PPP loan forgiveness application for her second-draw PPP loan. In her second-draw PPP loan forgiveness application, the Defendant falsely certified or caused to be falsely certified that "Borrower has complied with all requirements in the Paycheck Protection Program Rules . . . including the rules related to eligible uses of PPP loan proceeds."

On or about August 29, 2021, CC-1 submitted or caused to be submitted a PPP loan forgiveness application for his first-draw PPP loan. In his first PPP loan forgiveness application, CC-1 falsely certified or caused to be falsely certified that "Borrower has complied with all requirements in the Paycheck Protection Program Rules . . . including the rules related to eligible uses of PPP loan proceeds."

On or about August 29, 2021, CC-1 submitted or caused to be submitted a PPP loan forgiveness application for his second PPP loan. In his second PPP loan forgiveness application, CC-1 falsely certified or caused to be falsely certified that "Borrower has complied with all requirements in the Paycheck Protection Program Rules . . . including the rules related to eligible uses of PPP loan

proceeds."

On or about September 1, 2021, Harvest approved each of the PPP loan forgiveness applications submitted or caused to be submitted by the Defendant and CC-1. The SBA, in turn, remitted in full to Harvest the total loan amount for the two first- and second-draw PPP loans approved for the Defendant and CC-1.

For purposes of this plea agreement, the Defendant agreed that her relevant conduct in the conspiracy involved losses of no greater than $40,000.

## SENTENCING GUIDELINES

The Government concurs with the Pre-Sentence Report ("PSR") calculation that the Defendant has is in Criminal History Category II. However, the Government disagrees with the Offense Level Calculation in the PSR. First, with respect to the enhancement for the loss amount, the Government is seeking +4 under U.S.S.G. § 2B1.1(b)(1)(C), not +6 under subsection D. Second, there are no facts set forth in the plea agreement that the enhancement under § 2B1.1(b)(12) should apply. Consequently, the Total Offense Level should be 9, with a range of 6 to 12 months in Zone B.

## LEGAL PRINCIPLES

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further

5

crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

A sentence to a period of home confinement at the bottom of the Guideline range set forth above is appropriate in light of the seriousness of the offenses and the Defendant's criminal history. The Government's recommended sentence is also designed to deter others, promote respect for the law, and offer rehabilitation to the Defendant.

### 1.     The Nature, Circumstances, and Seriousness of the Offense

The count to which the Defendant pleaded guilty is serious. She fraudulently obtained PPP loans and unemployment insurance. As crimes against the public fisc, all are victimized by this conduct. But the most vulnerable are particularly victimized, for these funds are for those in need—not a slush fund for the Defendant. Her willingness to steal this money for herself demands the Government's requested sentence.

### 2.     The Defendant's History and Characteristics

This is not the Defendant's first encounter with the criminal justice system. In fact, she has two prior convictions for, in essence, financial or property crimes. In 2020, she was convicted for stealing clothing. In 2022, she was convicted for possessing fraudulent debit and credit cards. The fact that she has once again committed a crime where she selfishly obtained something that did not belong to her for her own enrichment justifies the Government's sentence.

**3.      Other Factors**

Given the ubiquity of this sort of fraud, the Defendant's sentence will hopefully dissuade others from engaging in this sort of behavior. Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives she needs to make better choices and avoid criminal behavior in the future.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to a period of home confinement at the bottom of the Guideline range set forth below.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: _/s/ Solomon S. Eppel_
SOLOMON S. EPPEL
Assistant United States Attorney
D.C. Bar No. 1046323
United States Attorney's Office
Violent Crime & Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530